PIEDMONT AND ARLINGTON LIFE-INSURANCE COMPANY *v.*
EWING, ADMINISTRATOR.

1. Where, in an action against a life-insurance company brought by an administrator on a policy purporting to insure the life of the intestate, one of the defences set up was that the answers of the latter to certain questions propounded to him at the time of his application touching his habits of life, &c., were untrue, the burden of proving the truth of such answers does not rest on the plaintiff.

2. While negotiations were still pending between an agent of the company and the applicant, touching the precise terms of a contract of insurance, the amount of premium, and the mode of payment, a friend paid the premium, but concealed from the agent the condition of the applicant, who was then *in extremis*, and died in a few hours. The agent, in ignorance of the facts, delivered the policy. *Held*, that no valid contract arose from the transaction.

ERROR to the Circuit Court of the United States for the Western District of Missouri.

The case was argued by *Mr. E. C. Carrington* for the plaintiff in error, and submitted on printed argument by *Mr. Britton A. Hill* for the defendant in error.

MR. JUSTICE MILLER delivered the opinion of the court.

This was an action on a policy of life-insurance issued by plaintiff in error.

The defence is, that though plaintiff below, as administrator of Mr. Howes, whose life it purported to insure, had received the policy, it was, in reality, not delivered by the agent until after the death of the assured, and in ignorance of that event. This is not disputed. But plaintiff below insisted that a contract of insurance had been made between Howes and the insurance company before his death, which bound the company; and whether this was so or not is the principal question in the case.

Another defence, however, was, that the assured had in his application, in answer to the questions propounded to him, stated, among many other things, that his habits of life were correct and temperate, and had ever been so, and that he had never habitually used ardent spirits to the extent of intemperance; and in reply to the question, " Are you subject to, or have you

had, dyspepsia, diarrhœa, dysentery, disease of the heart, stom·ach, bowels, or any of the vital organs?" answered "No." The defendant alleges in his answer to the declaration that these answers were untrue.

On this branch of the case the argument of plaintiff in error is, that the burden of proving the truth of these answers was on plaintiff below; and that, if he failed to introduce satisfactory evidence on that subject, he could not recover. It is true that this court holds that all these answers are warranties, if so declared by the terms of the policy; and if any of them, however immaterial to the risk, is shown to be untrue, the policy is void.

The number of questions in this application which require an answer are from thirty to fifty in every case. They relate to matters occurring in childhood, or which concern the health or habits of the ancestors of the assured, and to other matters rather of opinion than fact, which it would be almost impossible to prove. To establish the truth of the answer would, in many cases, require the party to prove a negative. Take the points raised in the case. How can a man who has lived forty or fifty years prove that he never had dyspepsia or a diarrhœa, or any disease of the heart or bowels? and how can he prove that his habits of life have always been correct, and that he never drank ardent spirits to the extent of intemperance?

While it may be easy enough to prove the affirmative of one of these questions, it is next to impossible to prove the negative.

The number of the questions now asked of the assured in every application for a policy, and the variety of subjects, and length of time which they cover, are such, that it may be safely said that no sane man would ever take a policy if proof to the satisfaction of a jury of the truth of every answer were made known to him to be an indispensable prerequisite to payment of the sum secured, that proof to be made only after he was dead, and could render no assistance in furnishing it. On the other hand, it is no·hardship, that, if the insurer knows or believes any of these statements to be false, he shall furnish the evidence on which that knowledge or belief rests. He can thus single out the answer whose truth he proposes to contest;

and, if he has any reasonable grounds to make such an issue, he can show the facts on which it is founded.

The judge of the Circuit Court was, therefore, right in refusing to instruct the jury, that the burden of proving the truth of these answers rested with the plaintiff below.

The court submitted to the jury the question, whether, notwithstanding the policy was delivered to a friend of the deceased after his death, by the agent of the company, in ignorance of the fact of his death, there had been a contract for insurance before his death, which made this delivery a duty, and therefore valid; and, in doing this, the court placed before the jury hypothetically the principal facts proved on that subject, and said, if they found them as thus stated to be true, they were sufficient to justify a verdict for the plaintiff. This charge is the main error relied on to reverse the judgment.

All the evidence on this subject is in the record, and was parol. It appears that Howes was publisher of a newspaper; and that, the special agent of the company (Huff) desiring to advertise in the paper, an agreement was made that Howes should take a policy on his life for $5,000, and the cost of a year's advertisement should go towards paying the first annual premium. The advertisement was to cost $70, and its publication in the paper commenced at once. This was about the 28th August, 1871. Howes made his formal application; and the company sent its policy to the local agent, Bell, with instructions to deliver the policy on the payment of the balance of the first annual premium, — to wit, $17.70, the whole premium being $87.70.

"It further appeared in evidence," says the bill of exceptions, "that said policy was executed by the officers of the company, and forwarded to said Bell, and received by him at Jefferson City, Mo., about the sixth day of September, 1871, to be countersigned and delivered; that he tendered the same to said Howes, and demanded the cash part of said advance premium, — to wit, $17.70; but that said Howes did not pay the same, saying that the printing was to pay the first semi-annual premium on the policy; that he would write to Huff, the special agent of the company, with whom he had made the contract at Kansas City, about it; that, after giving said Howes time to

hear from said special agent, said Bell called again upon said Howes for the $17.70, but he did not pay said sum; and that afterwards — to wit, on the twelfth day of October, 1871 — said Bell, being about to remove to the neighborhood of Brazeto, fifteen miles from Jefferson City, called again upon said Howes, and found him sick. Howes told him that he would look up the accounts as soon as he was able to get to his office, and would settle the matter."

This evidence seems to be uncontradicted. On the fourteenth day of October, on or about six o'clock in the evening, Howes died, and Bell was at that time not in the city; but, on that day, Howes's friend and partner, Ragan (at what hour is not stated), paid to a man using the same office with Bell the $17.70, and gave a receipt for the bill for printing of $70, and took from the same person a receipt in full for the $87.70 paid on the policy, describing it by number. This receipt was signed " R. A. Hufford, for J. F. Bell, agent," &c.

Neither Hufford nor Bell knew of Howes's condition at this time. Hufford wrote to Bell what he had done, and requested him to send the policy by mail; which he did. There is some question raised as to Hufford's power to accept and receipt for the money; and if he had none, then as to Bell's ratification of his act.

But, in the view which we take of this case, this is immaterial; for we think, that, if Bell himself had done all that Hufford and himself both did, — that is, if Bell had received the money, given the receipt, and delivered the policy in the manner they were done, — there was still no valid contract.

It will, perhaps, be admitted, that if there had been no agreement before Howes was at the point of death, between himself and the insurance company as to the terms of the contract, Howes alone could not at that moment by any act of his perfect the agreement. It cannot for a moment be contended, that, while parties are still in negotiation as to the terms of a contract, one of them, learning of a total change in the condition of the subject-matter of the contract of which the other is ignorant, can at that moment accept terms which he has refused before, and by doing so bind the party who had offered those terms when the condition of affairs was wholly different.

The case before us is a striking instance of the attempt to do this.

There is no evidence to show that Howes and Huff, the first agent, ever came to any terms as to the amount of the premium, and but little to show that they agreed on the price of the advertisement. It is quite plain that when the policy was presented to Howes by Bell, and the balance of $17.70 demanded, that the parties had not then come to an understanding of the precise terms of the contract. It amounted to no more than this, — that the company should advertise in Howes's paper, that he should take a policy of the company for $5,000, and that the advertisement should go as payment on the first premium.

But Mr. Howes insisted that the advertisement should pay the first premium in full, and he refused to accept the policy on any other terms. It is not shown, nor is there any fair inference to be drawn from the testimony, that he ever changed his mind on the point. Time was given him to write to Huff, with whom he had negotiated; but it is not shown that he ever did so. After a reasonable time for this, he was again called on for the money, and did not pay; and, two days before his death, he was again called on by the agent, who was about to leave the town. His answer was, that he would look up the accounts as soon as he was able to get to his office, and would settle the matter. There is in all this no relinquishment of his claim that the printing was to pay all the first annual premium, and at no time a promise to pay the $17.70 in cash.

It seems impossible to conclude that up to this time there had been any thing more than negotiations; that there had been any meeting of minds on the necessary terms of the contract. The amount and the mode of payment were still under consideration.

To hold that when he was *in extremis*, an hour or two before he breathed his last, a friend could pay this small sum to an agent of the company, without the agent or the company having any idea of the condition of the dying man, and thus secure an obligation to pay his administrator $5,000 within sixty or ninety days, is to affirm that one party to a negotiation can delay his assent to the terms of the contract until the

changes of fortune enable him to reap all the benefits, and throw all the losses on the other side, and then, for the first time, do what was necessary on his part to make the contract obligatory.

This case differs very widely from those cited, in which a delay in payment has been treated by the court as waived. All such cases proceed on the ground that a valid agreement as to the terms of the contract has been made. In most of them one or two premiums have been paid, and the delay in paying subsequently has been waived or accounted for; or, the amount of the first payment having been agreed on, the agent or some one for the company has so acted with the assured in the matter as to show a consent to delay.

But in this case no delay was asked for. That was not the point in controversy. The amount due or to be paid was the open question; and we can see no evidence that on this point Mr. Howes ever in his lifetime agreed with the company on that subject; and if we could suppose that in the very presence of the event, in which his family was to get $5,000 for the payment of $17.70, he did then agree, it was certainly too late to bind the other party, whose first news of his danger was that he was dead.

For these reasons, notwithstanding the cautious manner in which the judge recited his view of what had been given in evidence, and left the jury to believe it or not, we think there was no such evidence of the existence of a valid contract as to sustain the verdict.

*Judgment reversed, and case remanded with directions to set aside the verdict, and grant a new trial.*