BRUNOT, Justice.
 

 The plaintiff is the widow of Julius W. Jones, deceased. She brought this suit in her capacity as administratrix of the succession of her deceased, husband. The prayer of the petition is for $6,000 with legal interest thereon from September 4, 1932, and costs. From a judgment in favor of the plaintiff, as prayed for, the defendant appealed.
 

 On page 3 of plaintiff’s brief, counsel say: “We will not repeat a statement of the case as it is correctly stated in the brief filed by counsel for defendant and appellant, and it is not necessary to burden the court with a repetition of the issues involved.”
 

 Our review of the record leaves no doubt in our minds that counsel for defendant have also correctly and fully stated the facts of the case. We therefore quote from their brief the following:
 

 “On February 9, 1932, W. D. Lloyd, agent for defendant, secured from Julius W. Jones a signed application for a policy of life insurance in the sum of Six Thousand And
 
 *832
 
 No/100 ($6,000.00) Dollars. Lloyd received no cash with the application, and issued no receipt. The application was forwarded by the Baton Rouge office of the defendant to the home office in Galveston, Texas. In due course, after a medical examination of the applicant, Policy No. 420490 was issued and forwarded to the Baton Rouge office for delivery, upon the payment of the premium .in the amount of One Hundred Fifty-Four and 74/100 ($154.74) Dollars. This policy was received in the Baton Rouge office on or about February 27, 1932. Immediately, N. A. Mc-„ Hardy, defendant’s assistant superintendent, accompanied by W. D. Lloyd, went to Den-ham Springs, Louisiana, to deliver the policy to Mr. Jones. The policy was not delivered to Mr. Jones on this trip for the reason that Mr. Jones was not in a position to pay the premium due upon the delivery of the policy. According to Mr. McHardy’s (defendant’s assistant superintendent) testimony, thereafter he made several trips, nine (9) or ten (10), to Denham Springs, in an effort to deliver this policy and to collect the premium due thereon due on delivery. On or about the fifty-ninth day after the receipt of the policy in the office of the defendant Company, Mr. McHardy, in the company of Lloyd, again went to Den-ham Springs to see Mr. Jones, in a final attempt to ‘place’ the policy and collect the premium. Mr. McHardy stated to Mr. Jones at this time that unless the policy was accepted and the premium paid on this day, it would be necessary for him to return the policy to the home office for cancellation. It is a rule of the defendant Company that a policy of insurance may be retained for delivery for a period of sixty (60) days, at the expiration of which time the policy must either be returned or remitted for in cash. Mr. Jones, according to Mr. McHardy’s testimony, stated that he was unable to pay the premium, and that the policy would have to be returned. Accordingly, on April 29, 1932, the policy was returned to the home office as ‘not taken’ and for cancellation.
 

 “Plaintiff offered testimony that at the time Lloyd, defendant’s agent, accepted the application from Julius W. Jones for this policy, Lloyd purchased an automobile from Easterly-Jones Motor Company, Inc.; that on this automobile Lloyd was allowed a credit of One Hundred and No/100 ($100.00) Dollars, which was to apply against the premium on this policy. Easterly-Jones Motor Company, Inc., also gave Lloyd, individually, a note for Fifty-Four and 74/100 ($54.74) Dollars, as the balance of the premium. This testimony was objected to by counsel for respondent for the reason that no such allegation had been set forth in plaintiff’s pleadings, and for the additional reason that plaintiff’s petition alleged payment, and that ‘payment’ means payment in cash. The Court admitted this testimony, subject to objections.
 

 “After the return and cancellation of the policy, respondent considered the matter closed.
 

 “On or about August 9, 1932, Mr. Easterly, Mr. Percy, one of the attorneys for the plaintiff herein, and Mr. Lloyd called at respondent’s office in Baton Rouge, and demanded delivery of the policy, offering at that time to pay the premium. Mr. McHardy, respondent’s assistant superintendent, was absent from the office. Miss Ruth Webre, a clerk, was in charge of the office. Miss Webre, at the request of Mr. Easterly and Mr. Percy,
 
 *834
 
 made a transcript of respondent’s office record covering this policy, adding to this transcript certain credits that were not shown on respondent’s records. On the following day Mr. Easterly and Mr. Percy again called at the Baton Rouge office and made demand upon Mr. McHardy for the delivery of this policy, again tendering the premium. Mr. McHardy stated to Mr. Easterly and Mr. Percy that this policy had been cancelled, but that if Mr. Julius W. Jones would again submit to a medical examination, he would take the matter up with the home office and endeavor to have the policy re-issued. This was not satisfactory to Mr. Easterly and Mr. Percy, for the reason that on this date Mr. Julius W. Jones was in the Charity Hospital, in a very serious physical condition. Mr. Julius W. Jones, the alleged insured, died in the Charity Hospital, in the City of New Orleans, on September 4, 1932, without having been removed therefrom.”
 

 From our examination of the pleadings, we find that the petition contains the necessary allegations for recovery, but a mere reading of the evidence convinces us that the material allegations were not proven.' For instance, it is alleged that the deceased paid the initial premium on the policy sued upon to the defendant through its agents and it was accepted by them.
 

 This allegation is positively disproved by the testimony. It is clearly and unmistakably shown that defendant’s local agents made repeated demands upon the insured for payment of the premium, in vain, and the day before it became necessary to collect the premium, or return the policy to the defendant’s home office for cancellation, they made a final demand upon the insured, and were informed by him that he could not pay the premium. Failing to collect the premium, the policy was returned to the defendant’s home office and canceled.
 

 A mere reading of the statement of facts quoted supra, the effect of which plaintiff seeks to destroy, by testimony at variance with the allegations of the petition, and which was admitted in evidence over the objection of counsel for the defendant, leaves no doubt in our minds that plaintiff has signally failed to establish, in this suit, any liability on the part of the defendant.
 

 In the case of Piedmont & Arlington Life Insurance Co. v. Ewing, 92 U. S. 377, 379, 382, 23 L. Ed. 610, 612, 613, a much weaker case for the defendant than the one now before us, the United States Supreme Court said:
 

 “All the evidence on this subject is in the record, and was parol. It appears that Howes was publisher of a newspaper; and that, the special agent of the company (Huff) desiring to advertise in the paper, an agreement was made that Howes should take a policy on his life for $5,000, and the cost of a year’s advertisement should go towards paying the first annual premium. The advertisement was to cost $70, and its publication in the paper commenced at once. This was about the 28th August, 1871. Howes made his formal application ; and the company sent its policy to the local agent, Bell, with instructions to deliver the policy on the payment of the balance of the first annual premium, — to wit, $17.70, the whole premium being $87.70.
 

 “ ‘It further appeared in evidence,’ says the bill of exceptions, ‘that said policy was exeeut
 
 *836
 
 ed by the officers of the company, and forwarded to said Bell, and received by him at Jefferson City, Mo., about the sixth day of September, 1871, to be countersigned and delivered; that he tendered the same to said Howes, and demanded the cash part of said advance premium, — to wit, $17.70; but that said Howes did not pay the same, saying that the printing was to pay the first semi-annual premium on the policy; that he would write to Huff, the special agent of the company, with whom he had made the contract at Kansas City about it; that, after giving 'Said Howes time to hear from said special agent, said Bell called again upon said Howes for the $17.70, but he did not pay said sum; and that afterwards, — to wit, on the twelfth day of October, 1871, — said Bell, being about to remove to the neighborhood of Brazeto, fifteen miles from Jefferson City, called again upon said Howes, and found him sick. Howes told him that he would look up the accounts as soon as he was able to get to his office, and would settle the matter.’
 

 “This evidence seems to be uncontradicted. On the fourteenth day of October, on or about six o’clock in the evening, Howes died, and Bell was at that time not in the city; but, on that day, Howes’ friend and partner, Rag-an (at what hour is not stated), paid to a man using the same office with Bell the $17.70, and ga‘ve a receipt for the bill for printing of $70, and took from the same person a receipt in full for the $87.70 paid on the policy, describing it by number. This receipt was signed ‘R. A. Hufford, for J. E. Bell, agent,’ etc.
 

 “Neither Hufford nor Bell knew of Howes’ condition at this time. Hufford wrote to Bell (vhat he had done, and requested him to send the policy by mail; which he did. There is some question raised as to Hufford’s power to accept and receipt for the money; and if he had none, then as to Bell’s ratification of his act.
 

 “But, in the view which we take of this case, this is immaterial; for we think, that, if Bell himself had done all that Hufford and himself both did, — that is, if Bell had received the money, given the receipt, and delivered the policy in the manner they were done, — there was still no valid contract. * * *
 

 “But Mr. Howes insisted that the advertisement should pay the first premium in full, and he refused to accept the policy on any other terms. It is not shown, nor is there any fair inference to be drawn from the testimony, that he ever changed his mind on the point. Time was given him to write to Huff, with whom he had negotiated; but it is not shown that he ever did so. After a reasonable time for this, he was again called on for' the money, and did not pay; and, two days before his death, he was again called on by the agent, who was about to leave the town. His answer was, that he would look up the accounts as soon as he was able to get to his office, and would settle the matter.
 

 “There is in all this no relinquishment of his claim that the printing was to pay all the first annual premium, and at no time a promise to pay the $17.70 in cash.
 

 “It seems impossible to conclude that up to this time there had been anything more than negotiations; that there had been any meeting of minds on the necessary terms of the contract. The amount and the mode of payment were still under consideration.
 

 
 *838
 
 “To hold that when he was in extremis, an hour or two before he breathed his last, a friend could pay this small sum to an agent of the company, without the agent or the company haying any idea of the condition of the dying man, and thus secure an obligation to pay his administrator $5,000 within sixty or ninety days, is to affirm that one party to a negotiation can delay his assent to the terms of the contract until the changes of fortune enable him to reap all the benefits, and throw all the losses on the other side, and then, for the first time, do what was necessary on his part to make the contract obligatory.”
 

 See, also, Hoffman v. John Hancock Mutual Life Insurance Co., 92 U. S. 161, 23 L. Ed. 539; Cooley’s Briefs on Insurance, Vol. 1, p. 700, Medium of Payment.
 

 Eor the reasons assigned, the judgment appealed from is avoided and reversed, and plaintiff’s suit is dismissed, with costs in both courts.